Mr. Perry, I thought this was your fan club. What's going on? I'm a little disappointed, Your Honor. I'm sure Bill James is fan club. You too, Mr. Morton. Thank you, Your Honor. Thank you, Your Honor. We're good, Mr. Perry. Thank you, Judge Wallach. May it please the Court. During his deposition, Dr. Michael Weinblatt, AbbVie's expert on the state-of-the-art, was asked the following question and gave the following answer, and this is at page A1952. Question. Would one have expected that treatment of RA, rheumatoid arthritis, as of August 1, 1995, might achieve significant examples of near remission in patients? Answer. I think it's unlikely, back in 1995, that we would achieve that goal in patients with chronic rheumatoid arthritis. Later in his deposition, our client cleared this point up by asking, and Dr. Weinblatt agreed, and this is at page A1964. A person of skill in the art, quote, could not have predicted at that time that near remission would have occurred in many patients. And at page A1965, quote, one of the surprises in this clinical trial was that many patients achieved a result which was near remission, end quote. These quotes from Dr. Weinblatt, this evidence, is alone sufficient to require reversal of the summary judgment in this case, and let me explain why. The 120 patent, it's now before the Court, was prosecuted after Dr. Weinblatt made this deposition. What was going on was Abbott was challenging the 442 patent, the first species patent. In discovery, Abbott presented its expert, and Dr. Weinblatt's testimony, part of which I just read you, his testimony was this. He said, I, and therefore a person of skill in the art, in 1995, would have predicted a so-called Paulus 20 reduction, the standard reduction that was claimed in the 442, but I would not, and a person of skill in the art, would not have predicted. It was claimed in the 442? Your Honor, the 442 was described a significant reduction, and the disclosure said Paulus 20. It did not say Paulus 50. What was brought out in the deposition was that Dr. Weinblatt would have predicted a Paulus 20 reduction, but would not have predicted a Paulus 50 reduction. Therefore, the applicant, the patentee, Kennedy, went to the Patent Office, amended a pending application, and added claims specifically to claim Paulus 50 reduction, that's claim one, and near remission, that's claim 19. Your argument today is the 120 claims are patently distinct over the 766 claims. Well, that's the ultimate ODP question. And now, but I guess the way this case has come up to us is collateral estoppel. You're right. Which is whether, essentially, the issues that were litigated last year are essentially identical to what you're arguing today. That's correct, Your Honor. The District Court, before the evidence was even in, before the pleadings were closed, no evidence in the second case on, from our side or from Abbott's side, said this… The starting point of trying to understand the relationship between this case and that case is on what I'll call a more general level. They share the same attributes in the sense that last time around, your client was trying to get a patent on a species in the sense that a smaller subset of even sicker patients that resulted and yielded an even higher, more beneficial result. Yes, Your Honor. And that's a little bit what's going on here in the sense that thematically, those are the two limitations, again, that we're focused on here, where now you have more description of what that patient population is in the claim and you have more detail about what the actual benefit that would be yielded from performing the method. Judge Chen is absolutely right. It is a narrower species of the 766 patent. And the question before this Court in this appeal we submit is whether the invalidation of 442 precludes us even from litigating the validity of the 120 because, of course, they are presumed to be separate, separately valid. They are separate claims, separately allowed. And what the District Court's error here was, was simply mapping the decision as to 442 onto 120 when the relevant, the whole disputed issue was what a person with a skill in the art would have predicted or unexpected results. Unexpected results. Well, and in a sense, aren't we working in that same area again today, you know, whether this particular species would be deemed to be unexpected results in the base of the 766 claim? We are, Your Honor. And last time around, the question was, was it appropriate to consider the T14 study that was disclosed and described in the specification to try to understand whether there was an unexpected result between the 442 species claim and the 766 more generic claim? And the answer is that grounds for unexpected results was rejected because what we saw was it wasn't unexpected given the fact that that was the very utility for the 766 claim. That was the basis for it, the T14 study. And so the question is, why this time around, is it appropriate to look at the results of the T14 study to prove up unexpected results for this particular species in light of what was said in the last litigation? Because, for two reasons, Justice Chin. First, this Court in the last litigation did not foreclose all species claims. In fact, the opinion is quite clear that this is not one of those genuses that has every conceivable species was envisioned. And second, we have the testimony from the challenger's expert. This is a summary judgment case testifying that this species, the species claimed in 120, was unexpected. That at that time, no person with skill in the art would have expected near remission. And when I stood at this podium a year ago and argued unexpected results, Judge Dyke pointed out three times, and I can give you the citations you like, that remission was not claimed in 442, which is absolutely right. We went back to the Patent Office and we claimed near remission in 120, and that is a significant difference because of Dr. Weinblatt's testimony. Can I ask, to see if I understand the point. In the last case, the question was whether a dosage necessary for even reduction, because the 442 claim says reduce or eliminate. Correct. Was non-obvious, unexpected in light of a claim to something therapeutically effective. Correct. The question here is whether a dosage that produces big and long-lasting effects is non-obvious, unexpected in light of a claim to therapeutically effective. And those are different questions. Those are different questions. Therefore, no issue preclusion. Therefore, no issue preclusion. And then you can litigate the question whether this new claim is in fact obvious or not in light of therapeutically effective. Absolutely right, Your Honor. And the reason for that is the testimony of Abbott's expert, Dr. Weinblatt. And in the first trial, Judge Chen and Judge Toronto, the district court issued this 107-page, 410-paragraph, 32-foot note opinion in which the word remission nowhere appears. So the unexpected result of remission was never examined in the first trial. Can I just try to be precise about one thing? Sure. I use the term dosage because I guess I have in mind the background principle that mere new results, even spectacular new results from old steps, don't create anything patentable. So this has to be a dosage necessary to produce the big and long-lasting effects. Dosage may be a little imprecise. It is actually the administration of the claimed combination, including the antibody that binds to the particular site. But you mean some language like in amounts, et cetera? Yes, Your Honor. The easiest way to look at it is the chart. Because if you were doing exactly the same physical thing, it wouldn't matter what the results were. That's correct. Well, yes. Here we are claiming a very specific method, much more specific than the 766, in a particular patient population. Right. I'm putting aside patient population, everything except the big and long-lasting effect. To achieve this particular result. That's right. And the binding effect of the antibody, which is claimed in Claim 1 and Claim 19, was not claimed in Claim 766. In other words, it has been narrowed on each of those vectors in a way, again, that Abbott's expert testified would not have been expected. You didn't rely on that here, though, right? You didn't rely on the chain of reactions that happened in terms of what binds to what. Well, we did, Your Honor. The district court said it makes no difference. The district court went through each of the three differences and said, this makes no difference, we've already litigated it. And it was just wrong on all of these, Your Honor. It says, for example, that the court already determined that the 442 claims did not yield unexpected results. Well, that's true. That was what this court affirmed. But the court never determined whether the 120 claim achieved unexpected results. And our whole point in a collateral estoppel case, it's simply too glib and too flip to say it's deja vu all over again, as my friend Mr. Morin does. What we have to do is look at the actual claims. And here we have claims allowed by the office during this litigation. We submitted all the briefs, all the trial transcripts, all the public documents from this litigation to the Patent Office. And got those narrowed claims specifically in light of the arguments that Abbott was making against the 442. Because remember, the first time around, what Abbott tried to do was broaden the 442 so that it mapped straight on to the 766. And said these are essentially the same thing. That was a successful strategy. While they were trying that strategy, we went and said, okay, let's get a very narrow patent. A very, very narrow patent, which is the 766. Claim 19 of the 766 is very narrow. But in the end, I thought that the last litigation ultimately held that you can't rely on the results of the T14 study disclosed and described in the 766 to establish unexpected results for those claims. And so I'm trying to understand why on this go around to the 120 claims, it's okay to rely on the information and the results of the T14 study for unexpected results. Your Honor, we have to rely on the T14 study because all the claims have to be supported by the specification. It's a common specification because it's a continuation patent. We are not relying on T14. T14 is the results. The factual question for 120 is were those results unexpected as of August 1, 1995? The answer given by Abbott's expert, the factual answer. This is a grand inquiry. This is a factual inquiry. It's unexpected in light of the claims in the 766. Yes, Your Honor. And the utility and the basis for the 766 claims is the very same information in the T14 study. That's ultimately what we arrived at last year. Well, that's what you arrived at as patient population. The court never considered unexpected results as to outcome, patient outcome, which is why Dr. Weinblatt's testimony is so critical, which my friend doesn't want to talk about. Remember, they addressed it in one sentence of their brief, page 52 and 53, and all they say is, well, he was talking about something else. But I thought in the last opinion we did look at it in terms of efficacy and improved health. Your Honor, only as a significant reduction, Your Honor. And because 766 claims, the way that the court construed the 766 claim of therapeutic benefit was a significant reduction, which was what was claimed in 442, they were the same. Here what's claimed is near emission or policy. Absolutely not claimed. In fact, if you look at the undisputed facts in this case. Not recited in the 442 claim. Correct. But nevertheless, that is, again. Supported by the same specification. Information from the T14 study. Well, but if that's the answer, Your Honor, then you could never have a species claim in a continuation patent because it always has to be supported by the specification. And the court also ruled in that same opinion that a genus patent does not preclude a species patent, which has always been the law. And the question is whether this species, the 120 species, is one that would have been envisioned by a person of skill in the art of the time. The court said one thing as to 442. We submit there's a different answer for 120. I don't think the opinion last year necessarily foreclosed any reliance on any aspect of the spec. But what it did talk about is for this particular case, this particular section of the patent, it's not going to be permitted to use that to establish unexpected results over the 766 claim, especially given that this is the very study that your client relied on to in prosecution history to overcome a rejection to get the 766. And to get the 120 on precisely this point, because let me try it this way, Judge Chen. The results are what the results are. It's a clinical study. The question is whether those results would have been expected by a person of skill in the art. Would have expected the T14 results. You're down to a minute, Mr. Perry. Dr. Weinblatt testified that he and others would not have, and that's enough to get us past summary judgment and a trial on obviousness. All we want is a trial to prove these points. You and I are discussing the merits of the case which the judge cut off on the collateral estoppel ruling. Thank you. Go ahead, Mr. Moran. May it please the Court, Michael Moran on behalf of AbbVie. The starting point for the collateral estoppel analysis is to compare the claims of the 442 patent, which this Court has already determined to be invalid, with the claims of the 120 patent to determine what, if any, differences that there are. Kennedy here has alleged two differences. First, they say that the 120 claims, the new claims, are directed to a sick or patient population. And second, they say that they require improved efficacy, and this is the remission thing that Mr. Perry has talked about. But before we talk about these two alleged differences, and I'll get into those in some more detail and answer also the remission point, I think it's imperative to focus the Court on something Judge Toronto asked about, which is what's the same between the two patents. And that is that it is undisputed that when comparing these two patents, that in this new patent, the one that's been invalidated now by the district court, it is the exact same method of treating patients with the exact same disease that they're trying to get against. But I guess that's what I take, in fact, the claims not to be. That is, the amounts, or is it the amounts used? The doses, multiple doses. I infer that, in fact, different amounts may be required for the much better results. No, Your Honor, with due respect, I disagree. How do we know? How do we know that? And when you look at the claims themselves, they claim the same. That's what I'm doing, looking exactly at the claims. Right, they claim the same methods of treatment. But they claim it in terms of doses wherein a certain result occurs. So that result may require a different dose from doses wherein there's a reduces or eliminates effect, mere reduction. Your Honor, two responses to that. Number one is I don't think that was ever the argument below, that there's a difference in the dosing amount. They're just claiming a difference in effect. But you also have not made the argument that the effect, the efficacy, is completely irrelevant to patentability. Because if you're doing the same thing, it doesn't matter if you say, wow, what a great effect. We've always been doing this. With due respect, Your Honor, I think that we have said that exactly. If you look at our citations, for example, Your Honor, in the brief, to the King Pharmaceutical case or to the BMS case, both of those cases stand for the proposition that if you go and you claim the same method that's already present in the prior art, then that is not, even if you claim better results, even if you claim something better happens out of it, that that is not a basis for patentability. But I would say one step beyond that, Your Honor, is that there is no question that they have tied these results of supposed remission in the previous litigation and litigated all these issues already. If I look at their blue brief from the Kennedy One case, Your Honors, the blue brief from the last appeal that was before you all, they argued seven times that the natural result of practicing the claims that you've invalidated, the 442 patent, is remission. And I'll quote from page 58 from their blue brief in the Kennedy One case. Kennedy adduced evidence, extensive and unrebutted evidence, that patients receiving the claim therapy, that's the therapy of the 442 patent that you've already invalidated, experience relief of signs and symptoms sufficient to approach disease remission. They have already said that it's the same method, that you get disease remission by practicing the claims of the 442 patent. That's the same patent that this court has already invalidated. What it boils down to, Your Honor, is that the two differences that they allege, and this is even what they, they don't allege a difference in the method, Your Honor. If you look at their blue brief in this case, let's turn to their blue brief in this case. Is the method steps of the 442 somehow different? I see Judge Toronto focusing on the 120 claim one about multiple doses of the antibody. And then multiple doses of the methotrexate. Was that the same pattern of steps that was recited in the 442? Absolutely, Your Honor. If you look at claim two, for example, methotrexate is given weekly. That's how the drug is administered. There's no dispute on that issue. If you look at claim two of the 442 patent, I'm looking at A93 in the appendix. Claim two that's been invalidated is the method of claim one where the antibody, the TNF antibody or fragment thereof, is administered multiple times, and that's an interval of a week or weeks. So there's that multiple dosing step. Moreover, the evidence was presented last time, this is not a new issue, that in terms of the dosing amounts, Your Honor, Judge Toronto, if you look at claim one, for example, as we talked about last time, it is a dose that would cover any possible dosings of .01 to 100 milligrams per kilogram. All of those claims have already been invalidated. The only alleged difference in these claims that's raised on appeal here is twofold, and if you look at their table of contents in their blue brief, you will see that. The two differences, according to them, are A, patient population, and B, efficacy. They label them that way, they characterize them. There's no difference in the method. If you look at, I think it's little i, which is their table of contents and how they characterize everything, and it's carried through to the rest of the brief as well, what you will find is that there's two differences that they say, patient population and the efficacy of the treatment, not a difference in the treatment. When you turn to patient population, the first one, Your Honors, I think that we've been pretty clear on the record that given that this court invalidated the 442 patent claims under the precise definition of active disease that's now in the 120 patent claims, that there is no difference in the patient population between the invalidated claims and the claims at issue here. That leaves only one difference, and that one difference is the alleged difference in efficacy. Is there some way of concluding that because the results have been claimed differently, more precisely here with the 120 claims, that that demands or commands that the method steps be performed perhaps differently, or that there's now a distinction in how you do the method steps? I would say the answer is no in multiple respects. First of all, there's no difference in what's set forth in the claims in terms of the method steps, so the method is not claimed any differently. I guess the point that I keep having in my head is when it says give amounts that produce terrific effects, those might actually be different amounts from when the earlier patent said give amounts that may produce pretty nice effects. Yes. So there is a possible physical difference in the steps performed. In theory, I understand what you're saying, that different methods could yield different results. I would say two things, three things. Number one is the difference in method isn't claimed. If you're comparing two claims and you look at it from an anticipation analysis, all the steps of the method are the same. But the two other important things are, first of all, going to the T14 study, in order to get their first patent, the 766 patent allowed in the first place, they relied on the same results and they said those results were commensurate with the first patent that they already achieved, the 766 patent. They did not just look, for example, at the 20% Paulus criteria. They cited to the entirety of Example 1. And they did not just look, for example, at Table 2, which was 20% Paulus criteria. They specifically cite to Table 4. They linked these results to the first patent that died a natural death after 20 years. Having gotten the first patent by saying that those are the results that you get from co-administration generally, and that's the patent that died a natural death and that we paid royalties under, they can't then come back and say, hey, we're getting largely different results here. As a matter of fact, and this is in the record, Your Honor, and we cite to it, when they got the first patent allowed in the first place, the 766 patent, they said these are the results that you would get from the practice of this method, co-administration generally, with the entire patient population. Having done that, and having already relied and said that you get these results with the broader patent, the one that has expired at this point in time, their first patent to this method, they can't now double-dip and say you didn't get those results in the first place. I think the argument you just made in the last two minutes is a straight, obvious, double-patenting argument, not a collateral estoppel argument. I disagree, Your Honor, for two respects. One is all of these aspects of remission and 50% were heavily in front of both the district court and this court the last time around when the district court and this court found that those were not unexpected results, that there were no unexpected results. The second reason is that the issue… But those two things that you just said at the end are different. The only question actually before the court last time was whether what the 442 said was unexpected, and what the 442 said included mere reduction. So even if there were other arguments being made, the resolution of those arguments, which is actually not explicit, was not, whatever else it is, necessary to the resolution of the 442 question because that doesn't claim remission or its equivalent. I actually disagree with your respect, Your Honor, for two respects. One is that both the district court and this appellate court, they relied on the so-called unexpected results that were set forth in the specification to try to support the claims. Of course, patentees often will rely on unexpected results that are not specifically set forth in the claims, and they say these are unexpected or surprising results. They did that. They did that at the district court with 50% and with remission repeatedly. They did that in front of this court, like I mentioned, seven different times. This court rejected the notion that there were any unexpected results associated with the practice of the claims in the 442 patent. I've also read you from their blue briefs the last time around how they said that remission was the natural result of claiming, of practicing the 442 patent. Given that they've said that, all they're trying to do is patent the same exact method once again just by specifying the results in slightly different ways. If this were allowable, Judge Toronto, one could get around collateral estoppel and case after case after case by simply the first time claiming 20% polis, and the next time you say at least 25%, and the next time you say at least 30%, and you keep claiming the same method again and again and again, and each time that you'd ask me the question, hey, we haven't evaluated 30% yet, you'd have to go back and you'd have to do it all over again. That is not what the law requires under collateral estoppel. What the Borns case says is you don't do it with the 19th century aspects of a textbook. You do it with realism and pragmatism. And what's happening here is that they keep claiming the same method again and again and again. With respect to Dr. Weinblatt's testimony that he wouldn't have expected the results at the time, that may be why they got the 766 patent in the first place, which they also based on those same results. When he looked at that and he said, I wouldn't have expected such great reactions at the time, that obviously wasn't in the context of reading the T14 study. And the imperative point, and really the only point that you need to look at to answer this entire question in this case is that this court has already determined dispositively that you are entitled to look at the T14 study when you're looking at the obviousness of the claims and that that can't be a basis of non-obviousness. And given that that is the case, it ends the inquiry here. They're relying on the exact same study. And let me point out where that's true, Your Honors. If you look at their briefs, for example, and you have any questions. When I was up there, I never put water near my work. Yes, thank you. Appreciate that, Your Honor. And if you have any question that they're doing the exact same thing that this court said you couldn't do the last time around in Kennedy 1. In Kennedy 1, you said you can't distinguish the obviousness of the second patent based on the T14 study example 1 of the first patent. The court said that flat out. If there's any question that they're relying on the exact same data, again, which you cannot use to distinguish obviousness. Sorry for a different proposition. I would say they're looking at the exact same data, though. And if it's permissible. The question is what you're using it for. I'm not sure that that's the issue. They've already used that same data from the T14 study to get the 766 patent allowed in the first place. Once they've relied on that same data, for them to go back in and act like these are surprising new results or non-obvious species within the genus has already been ruled out in the Kennedy 1 case. In the Kennedy 1 case, the court said, quote, to determine the question of obviousness, we must necessarily look at the 766 patent's disclosures to assess what results were expected at the time that the 766 application was filed. Did the court in the 2014 case rule out a case of unexpected results that relied on a combination of the T14 study plus your expert's admissions, assuming that those are properly characterized? Just assume that. Well, first of all, his admissions are only... I don't want to... Okay. But it's not the same record, right, that this court ruled on in 2014? It was certainly the same available record. Dr. Weinblatt testified in that trial after his deposition. They had the entire record available in front of them, and Dr. Weinblatt testified in that case. But I think the Weinblatt testimony must be seen as a sound bite that my friend is using at the beginning of his argument but can't be meaningful. When our expert, Dr. Weinblatt, is asked whether you would expect that time-to-result remission in that timeframe, it's obviously in the context of not looking at the T14 study. Once you look at the T14 study, which permitted them their first patent in the first place, the 766 patent in the first place, then, of course, reading the results of the study, you would anticipate the results of the study. It's tautologically correct. Once they've set forth the data in the T14 study, if you're allowed to consult that, which this court already said in Kennedy 1, because that was the utility for which they established the 766 patent in the first place. Can I ask you this question? Please. So there's a very strong background rule for, I think, pretty obvious reasons that says, material in the specification of patent number one, if never before published, isn't prior art, and that can't be used. The 2014 case, the predecessor case of this one, comes along and says, well, there's an exception to that for utility. Now, because of the way the 442 patent was written to cover any reduction, it seems to me, and I'd like your reaction, that this court did not have to parse more finely what the scope of its utility exception was, whether it was enough to establish sufficient utility for the 766 to have been patentable, or whether it was the full content of the specification set out T14 study with all of its details, much of which was not necessary to establish utility. Why is, and I think you're making the argument, the full study gets to be looked at. Why is that a sensible doctrinal definition of an exception to a background principle of what is, after all, not prior art? And I see I'm out of time. I assume it's okay. It's a long question. Okay. Your Honor, there's two answers. Number one is, Kennedy, in order to get its first patent allowed, and that's what Dr. Weinblatt was talking about, looked broadly to the T14 study. Throughout the prosecution history, for example, it pointed not only to Table 2, it pointed to Table 4, which is the 50% policy. It said that these are the results that are gotten generally from the 766 patent. I think when the court talks about whether or not you're going to decide whether there are obvious differences, and it talks about the ability to rely on the T14 study, it is true that it leaves open the question, for example, of whether an Example 3 or some other example that wasn't relied on to establish utility of the first patent in the first place, whether or not you could look at those. But I think, with due respect, the court knows what it wrote here, but I think reading the decision, it is pretty clear that it says having relied on the T14 study, you're allowed to look at that study to discuss what the anticipated results of practicing the method would be. The second aspect I would answer to that is it was true that there was narrowing in the results from the 766 to the 442 patent, so they said you're even allowed to look at it when you're claiming slightly better results in the end of the day. And the third thing is to answer a question that Judge Chen asked relevant to that. The court did not only say that you could look at the T14 study, for example, in the question of the patient population. The court also specifically said you can look at the specification for what you would expect the results of the efficacy could be, and that's in footnote 8 of the decision when you talk about the reduction of signs and symptoms. And the court specifically said we go to the specification of the 766, and we see there that it says the practice of this method is expected to reduce the signs and symptoms. That's footnote 8. There is no difference other than we're changing the patent numbers from 442 to 120, and other than we're changing the words in which the result is described between the 442 and the 120, there's no difference between these cases, which is where I may be somewhat glibly say it's déjà vu all over again. We're just changing out the patent numbers and saying it's the same result that they're claiming again and again. If I may, Your Honor, in the end of the day, if you were going to permit this type of thing, we could go on endlessly by claiming the same method again and again, and each time giving them another bite at the apple just by slightly narrowing it. That's not what the law permits. All of these issues have been heard already and decided by the district court and by this court last year. Thank you, Your Honors. Thank you, Judge Wallach. As to the last point, we did not arbitrarily pick the claims of the 120 patent. They came from Dr. Weinblatt's testimony. He testified that it was unexpected to have Paulus 50 in near remission. We claimed what he testified, Abbott's expert testified, was unexpected. Just to be clear, that wasn't in the context of having knowledge of the T14. That's absolutely wrong, Judge Chen. Dr. Weinblatt was retained by Abbott in this lawsuit to study the specification of the 7-6 patent and testify about the obviousness of 442. The only professional job he had was to testify about the T14 study, and his testimony was 442 is obvious, 120 is not. That's the summary of his testimony. All of these explanations that Mr. Moran just offered, well, the one sentence of explanation he just offered here and in his brief, they could argue that at trial, but there's no evidence on it. Did Dr. Weinblatt testify about the merits of the 120 claim? No, Your Honor. In testifying about the 442, nobody has testified about the 120 claims because the court entered this summary judgment order before any discovery was going to be made. Right, so he testified about the 442 claim. But for Mr. Moran to say it was not about the T14 study is wrong because Dr. Weinblatt's job was to study the T14 that was in this patent. Judge Toronto, the T14, to get to that, not all outcomes in the T14 resulted in the 120 outcomes. For example, there was a one milligram dosage studied that did not result in remissions. It was only multiple dosing at higher outcomes. And the 442 patent, for example, claims single dosing. In fact, much of the debate we had last time I was here, we were both here, was about single administration and whether that qualified as an adjunctive and so forth. 120 explicitly claims multiple and explicitly claims a sufficient dose to create these unexpected results. Judge Chen, as to this prior decision, I think it's fair to read page 1380, including footnote 8 on the previous page, to say, the court was looking at the specification to define the patient population as allowed and utility in the context of that. And there's a statement here, for example, that the results in the T14 can demonstrate that a sicker patient would get better results. That's correct. What the court did not say and could not have said consistently with the ODP doctrine is that a person of skill in the art necessarily envisioned every outcome that might be within this specification. And what we have here is the unanswered question of what a person of skill in the art would have expected as the narrower things that were not claimed in 442. Again, as Judge Dyke pointed out last time. Now, Mr. Morin. Can you address the, I guess, I don't know, I'll call it the policy point that Mr. Morin made about a seemingly endless succession of potential claims. Yes, Your Honor. Small difference, small indifference, but all of them supported by the very same material that appeared in patent number one. So, black letter law says the initial granting allowance of a genus claim does not foreclose later species claims that have to be supported by the same specifications. That policy argument has already been resolved by this court for the last hundred years. And this court, in the last decision, wrote that in. A genus claim does not foreclose a species claim. As to the specific, what's the line, here we have the 120 patent that is based on objective criteria known in the art. Paulus 20 versus Paulus 50 was what was used by clinical researchers, remission. I'm just going to think a lot, but the genus species point is not in any way limited to cases in which the support for the species was in the original claim, is it? It is in the ODP context because the second patent always has to, in a continuation application, always has to be supported by the same specification  You can't change the specification. But establishing the expected results or not. That's the point, that is the point of inflection. External evidence. It requires external evidence, it requires expert evidence. We had a four day trial last time and the court wrote in footnote 12, the district court, in the last opinion that he credited Weinblatt rather than Lipsky, our expert. So this time around we said, okay, what does Weinblatt say about this new claim? And Weinblatt says, it's not expected. And that's the difference because the chain of genus versus species, you always have to be supported by the same specification. You always have the evergreening concern in the abstract. The question is, as this court wrote in the last opinion, is this species, the particular species being studied, one that would necessarily have been envisioned by a person of skill in the art, knowing everything that they knew as of August 1, 1995? We know the answer to that question. We know the answer to that question because we asked Abbott's expert, and he answered, and you know what he answered. Thank you, Judge Welch. Thank you, counsel.